UNITED STATES DISTRICT COURT OF MASSACHUSETTS

GET IN SHAPE FRANCHISE, INC.

    Plaintiff,

C.A. NO. 1:15-CV-12997RWZ

v.

TFL FISHERS, LLC; ROSALYN R. HARRIS,

THINNER FOR LIFE, INC. and FIT CHICKS, LLC

    Defendants

## DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Defendant, Rosalyn R. Harris, Pro-Se, respectfully submits this Memorandum in support of Defendants motion to dismiss and in opposition to Plaintiff's motion for Preliminary Injunction.

1. **INTRODUCTION**: The Defendant intends to outline in this memorandum the following three facts in support of her motion to dismiss the Plaintiff's motion for a Preliminary Injunction:

    1) Neither the Defendant nor Fit Chicks LLC ever used GISFW trademarks subsequent to the Studio no longer being a GISFW franchise location in a manner that mislead any customers or potential customers. In the transition from GISFW to Fit Chicks, there were a small number of minor oversights (for example, a GISFW sign that was covered over instead of fully removed) for a short period of time but no customers or potential customers were ever under the impression that Fit Chicks LLC was in any way associated with GISFW.

    2) The Defendant, Rosalyn Harris, sold the assets that remained after the relationship with GISFW was severed to a third party, who is operating a business called "Fit Chicks". A preliminary injunction to prohibit Fit Chicks, LLC from operating would trample on the private property rights of the owner of Fit Chicks, LLC. It would also trample on the rights of the lessor of the location, who has a lease with Fit Chicks, LLC and not with GISFW. It would also cancel and invalidate the prepaid customer contracts of as long as one year that were

assumed by the new owner, causing severe harm to each of these customers. Furthermore, Fit Chicks, LLC is an independent and separately owned legal entity and cannot be enjoined in this lawsuit because it was not a party to the Franchise Agreement, or to any agreement, with the Plaintiff.

Such an injunction would cause irreparable harm to the purchaser of the TFL Fishers LLC assets and operator of Fit Chicks, LLC, to the lessor and owner of the leased space and to the customers of Fit Chicks, LLC who have prepaid memberships. The Defendant believes there is no legal precedent for this invasion of private property rights and it is certainly without merit. Furthermore, the Plaintiff has suffered zero economic loss as a result of any potential competition between Fit Chicks, LLC and GISFW .

3) Over the course of the Franchise relationship, the Defendant was charged numerous fees that were not disclosed in the Franchise Agreement and were in clear violation of franchise law, including the Indiana Deceptive Franchise Practices Act. Furthermore, the Defendant was misled with financial disclosure violations into believing the profitability of Franchised studio she purchased, and the franchised studios in general, were materially higher than they in fact were. In addition, GISFW's founder and CEO has maintained a skeleton staff and starved the franchise of marketing and other support needed to allow the Defendant to maintain profitability and that had been promised under the franchise agreement. Rather than providing this support, GISFW's CEO and founder has taken unprecedented stockholder distributions averaging over 45% of revenue in the three years ending December 31, 2014. At the same time, GISFW has increased non-royalty franchisee fees at over 25% per year (per studio) for the last three years while decreasing corporate staff.

As a result, the Plaintiff cannot establish a likelihood of success on the merits. The Plaintiff cannot establish irreparable harm as it has neither suffered nor proven any economic loss as a result of Fit Chicks, LLC operating. The requested injunction would violate the private property rights of the independent owner of Fit Chicks, LLC, the lessor the leased property and all customers of Fit Chicks, LLC that have prepaid memberships. The Plaintiff has not proven it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits. But the Defendant, the lessor, the Fit Chicks, LLC owner and the Fit Chicks, LLC customers would suffer irreparable harm should the Preliminary Injunction be granted. Furthermore, there are significant counter claims, the validity of which can only be determined by this honorable court via the judicial process. In addition, it is not even clear that this Honorable Court has jurisdiction, the reasons for which are raised in the Defendant's Answer to Complaint.

For all of the above reasons, the Plaintiffs Motion for a Preliminary Injunction to prohibit a third party from operating Fit Chicks LLC should be **denied.** Defendants request for reasonable attorney's fees to mount a defense and counter claim should be **granted**.

The Defendant also wishes to advise that Court that the Franchise Agreement restricts the Defendants recourse to all of the GISFW franchise agreement misrepresentations and violations to an arbitration proceeding in the State of Massachusetts, which would require payment of filing fees, legal fees and other fees likely exceeding $100,000 on the part of the Defendant. This is an amount that the Defendant simply does not have. The Defendant does not even have 10% of this amount. This limitation is in violation of the Indiana Deceptive Franchise Act. There are several other violations of the Indiana Deceptive Franchise Act by the Plaintiff, as described below. The prohibitive cost of this sole remedy means the Defendant effectively has had no ability to address the unconscionable abuses of the Plaintiff in disclosure violations, illegal fees charged and unethical and illegal behavior.

Given the numerous improper and illegal fees charged, the lack of financial resources of the Defendant to pursue a defense and counter claims of the illegal fees paid and the Franchise Disclosure Document (FDD) which did not comply with franchise law and many financial misrepresentations which may give rise to rights of rescission and restitution, the Defendant respectfully requests that the Court award reasonable attorney's fees to the Defendant. This is the only way that the Defendant can provide an adequate defense and pursue her own legal remedies under the law. The Plaintiff's average over $1 million dollars in net income for each of the last three years provide more than ample resources to provide reasonable attorney fees to the Defendant and to allow this Honorable Court to weigh in on the egregiousness of the Plaintiffs actions. Should the court determine that the Defendant's claims are valid, for the first time the Plaintiff would be held accountable for its illegal actions and the Plaintiff would be sent a strong message to curtail its illegal and abusive actions or risk further legal actions.

If the Court does not grant the request for legal fees, the Defendant requests that the court appoint a pro bono attorney to act on her behalf. The Defendant lives and works in the State of Indiana and her income approximates $35,000 annually. She also has $45,000 in debts and no liquid assets other than a minor amount in a checking account and does not own a home. The Defendant cannot afford to take the time of work to fly to Boston for every court appearance, not to mention the cost of doing so, nor can the Defendant afford the cost of an attorney for this complex case. Furthermore, the Defendant has no legal education or background and is unable to represent herself Pro Se throughout the case.

Many of the counter claims that are yet to be filed are very similar and in many cases virtually identical to those of every other franchisee in the GISFW system. These franchisees have been unable to pursue any legal remedy due to the restrictive and one sided Franchise Agreement and the prohibitive cost of doing so. Therefore, the Defendant's ability to obtain legal representation in this case is of critical importance not only for her, but ultimately for every franchisee in the GISFW system.

2. **DISCUSSION**

   A. **GISFW trademarks and logos have not been utilized by Fit Chicks LLC and no Fit Chicks customers or potential customers have been mislead**

The Plaintiff argues that GISFW trademarks and logos (the "GISFW Marks") are on the principal register of the United States Patent and Trademark Office. However, a visit to the USPTO website discloses that Plaintiff does not own this Mark is in fact owned by Brian Cook, not GISFW. Furthermore the USPTO website indicates that the principal oval logo that is used throughout the franchise system is also owned by Brian Cook and not Get In Shape Franchise, Inc (GISFW). The Plaintiff cannot assert its rights to a trademark that it does not own. Furthermore, Fit Chicks displays no GISFW marks of any kind in its studio, advertising or communications with customers.

The Plaintiff's Memorandum claims the company's "quick expansion and growing appreciation for its unique and effective small group personal training model". In fact the number of franchised outlets has not been quickly expanded but has been shrinking for some time. Per the company's 2014 Franchise Disclosure Document (FDD), there were 99 franchised outlets as of December 31, 2012, 89 at December 31, 2013 and 87 at December 31, 2014 (see Exhibit 1). This has been a direct result of the franchisor's managing the business for its own short term profit and its abusive treatment of franchisees.

Furthermore, the Plaintiff argues that one of the primary benefits of the GISFW Franchise is access to the goodwill of the GISFW Marks. While this may be true in Massachusetts, where there are 56 out of a total of 92 franchised outlets at December 31, 2013 (see Exhibit 2) and there is recognizable brand recognition as a result of these 55 units, this is not true in Indiana (the Defendants previous place of business) where there were only two franchise units as of December 31, 2014 and one currently. Note that there were 92 franchised outlets in December 31, 2013 per the 2013 FDD (Exhibit 2) but 89 as of the same date per the 2014 FDD (Exhibit 1). This is one of many FDD disclosure discrepancies.

In addition, GISFW does no national advertising, no advertising in the state of Indiana and yet has collected $300 per month from the Franchisee for a "national advertising fund" of which none was spent in the state of Indiana, or benefitted the Fishers studio. The only "goodwill" or name recognition of "Get In Shape for Women" in Fishers, Indiana is a direct result of the advertising dollars spent by the Defendant out of her own revenues and personal funds, and of the prior Fishers, Indiana franchisee. This required contribution to the National Advertising Fund is in spite of the Indiana Deceptive Franchise Practices Law – Section 23-2-2.7-1, (11) (a) which makes it unlawful for any franchise agreement where the franchisee is either a resident of Indiana or a nonresident who will be operating a franchise in Indiana to "Requiring the franchisee to participate in any" (A) Advertising campaign or contest." As the Defendant was both a resident of Indiana and operated the franchise studio in the state of Indiana, her required participation in the National Advertising Campaign, for which she received no benefit, was unlawful.

The Plaintiff states that "The photograph taken on June 20, 2015 showing the GISFW Marks only partially covered by a tarp sign reading "Fit Chicks"." While the "Fit Chicks" sign

4

was placed over the GISFW for a short period, it was replaced with a temporary sign thereafter (See Exhibit 3) and a permanent sign has been ordered (See Exhibit 4). Because the many tasks involved with the transition meant they could not all be done at once, the largely covered GISFW sign was completely removed on July 27, 2015. A new Fit Chicks sign has been ordered, and will replace the temporary Fit Chicks sign by Labor Day. Even when the GISFW was covered, there was no confusion that the studio was a GISFW studio and all customers were informed personally about the new ownership and new studio. The A-Frame sign that is referenced in the Plaintiff's Exhibit C does contain a GISFW mark and this was outside the studio for a 2 week period subsequent to the studio sale, which was an oversight. But this display is no longer being used, and no GISFW mark is being displayed inside or outside the studio or in any advertising connected to Fit Chicks. The new A-Frame sign has been in use and contains no GISFW marks (see exhibit 5).

The Plaintiff states that the Defendant is the registered agent for Fit Chicks, LLC. This is true, which was done as a matter of convenience and for a temporary period during the transition phase, as the Defendant is assisting the Fit Chicks owner with the transition, but the Defendant does not own Fit Chicks, LLC.

The website http://coachrozharris.com does not display the "Get In Shape For Women" name. Nor does it display GISFW marks. These were removed after the transition of the studio to independently owned "Fit Chicks". The http://coachrozharris.com has remained however because the Defendant continues to provide consulting services to the existing Fit Chicks clients as part of her Purchase and Sale agreement and such a website is very common in the industry. The Defendant is not a certified personal trainer. She's a professional life coach and provides coaching services via telephone video call to clients and others in and outside of Indiana. She holds group coaching programs, does metabolism testing, writes blogs, and speaks on weight management and wellness. She has done so for 10 years. These services do not compete in any way with any GISFW studios. The assistance being provided to the independently owned Fit Chicks is to help ensure Fit Chicks will be successful so that the lease and prepaid customer contracts can be honored.

The Fit Chicks facebook page contained getinshapeforwomen in the URL but nowhere in the content of the page. This was, again, a task that the new owner and Defendant, who are not computer savvy, overlooked and has now been corrected. The bottom line is, were a small handful of oversights made in the transition to new ownership and an independently operated studio ? Yes, but reasonable best efforts were made, these small oversights have since been corrected, and no customers or potential customers were ever under the impression that Fit Chicks was associated with or marketing itself as "Get In Shape For Women". They did obviously know that the studio had previously been a Get In Shape Women studio that had been sold and is now operating independently under new ownership.

**B. The successor company, Fit Chicks LLC is owned by a third party. A preliminary injunction prohibiting operation of this business would trample on the private property rights of the Fit Chicks LLC owner, of the lessor of the studio location who did not lease the studio to GISFW and has no relationship with GISFW, and of the Fit Chicks LLC customers who have prepaid membership contract that would be cancelled if the court approved the Plaintiff's motion**

    The Defendant agrees that on April 1, 2013 she entered into a Franchise Agreement with the Plaintiff. Also, on June 24, 2015 the Defendant acknowledges she sent an email notifying GISFW that the assets of TFL Fishers, LLC had been sold to a third party and closed the "Get In Shape For Women" studio. Given the existing lease in place, for which the Defendant was personally liable and the prepaid customer contracts, simply locking the doors would have resulted in customers losing their prepaid membership because the Defendant does not have the funds to reimburse customers and for the Defendant being liable for future lease payments. Instead, the Defendant arranged for the purchaser of the assets to assume the lease payments and perform the services expected **by the landlord and by** the customers to fulfill the obligations of the customer's prepaid contracts. These prepaid contracts vary in length of up to one year.

    Had she not done so and simply locked the doors, since the business was in an LLC, she would have had no personal liability to refund these contracts. Instead, out of a sense of obligation and fairness, the Defendant was able to sell the assets with the agreement that these prepaid customer contracts would be honored. As a result of the assumption of this liability, the net assets had little value, and the Defendant effectively gave the business away, selling it for one dollar.

    The Plaintiff claims that the Defendant is still operating the Fit Chicks studio. The Defendant is a consultant to Fit Chicks, without pay, to assist the transition and honor the lease and prepaid customer contract obligations. This consulting agreement will continue until July 2016. The Defendant also works for herself primarily as a life coach in order to pay her bills.

    The Plaintiff states that an email sent from myfitchicksstudio@gmail.com contained a statement that "our mailing address is: Thinner For Life Inc., 11720 Olio Road, #800, Fishers, IN 46037". As noted by the Defendant this corporation was dissolved in May 2015. Again, the Defendant is not legal savvy nor computer savvy and this administrative oversight in no way changes or reverses the substance of the fact that the Defendant sold the assets of the studio, the new owner assumed the lease and the liabilities of the prepaid customer contracts and the Defendant as part of this agreement was required to stay on to assist with the transition and performing training services to work off the obligations of the prepaid customer memberships.

The Plaintiff stated that "GISFW was contacted by former clients of Ms. Harris who reported that their paid-in-full contracts were not being refunded despite Ms. Harris's actions in ceasing operations at the Fishers Studio." It was actually the Plaintiff that contacted Fit Chicks clients with the following misleading and spiteful email:

**From:** "Lou DeFrancisco, President & COO - Get In Shape For Women"
<loudefrancisco@getinshapeforwomen.com>
**Date:** July 16, 2015 at 10:25:35 AM EDT
**To:** getinshapefishers@yahoo.com
**Subject: Get In Shape For Women - Fishers, IN**
**Reply-To:** loudefrancisco@getinshapeforwomen.com

Hello Current and Former Clients of GISFW - Fishers, IN:

It has come to our attention that Roz Harris, the owner of the Get In Shape For Women studio in Fishers, IN, has decided to violate her Franchise Agreement and run the studio under a different name.

We plan to take legal action and seek immediate injunctive relief based on her violating the Franchise Agreement, Non-Compete, and Trademark Infringement. We will also sue Roz Harris personally, so any prepaid sessions you paid for can be recovered. We plan to return operations of the studio to a Get In Shape For Women as quickly as possible.

The Get In Shape For Women franchise currently has 87 locations in 16 states in operation, helping over 10,000 active clients reach their goals.

We apologize for any confusion, and we look forward to delivering the Get In Shape For Women model to the ladies of Fishers, IN soon.

If you have any questions, please don't hesitate to reach out.

Thank you,

Lou

Lou DeFrancisco
President & COO
Get In Shape Franchise, Inc.
75 Second Ave., Suite 220
Needham, MA 02494

To be clear, not a single client asked the Defendant for a refund as of the filing date of their Complaint and only one subsequently, for reasons unrelated to the studio sale.

While the Defendant simply does not have the money to refund clients, she has undergone great personal sacrifice to ensure that existing prepaid customer contracts are honored. The Plaintiff on the one hand complains that an independent studio is operating and on the other hand criticizes the Defendants efforts to honor the prepaid customer contracts. All the while, many Get In Shape For Women franchise locations have closed their doors in the past and simply not refunded prepaid contracts nor provided membership access to another studio. Get In Shape For Women has never once refunded these customers their prepaid membership dollars. This, in spite of the fact that its CEO and founder, Brian Cook has taken over three million dollars in stockholder distribution in the three years ended December 2014 per its 2014 FDD. **This does not include any salary** he has taken, which is not disclosed separately, nor income received from operating and selling corporate studios, which are held in a separate entity. Yet the Defendant, unlike Get In Shape For Women, with virtually no resources of her own, at great personal sacrifice, has taken steps to honor these prepaid customer contracts.

Fit Chicks offers a completely different exercise program than GISFW including life coaching, a different workout routine and difference equipment (See Exhibit 6). All customers live within a 6 mile radius of Fit Chicks and other than one GISFW studio in Carmel Indiana, which has no customer overlap, there are no other GISFFW studios in the state of Indiana. The Carmel studio is 13 miles and 30 minutes' drive and the two studios have never competed with each other.

Furthermore, GISFW's small group training program and "nutrition coaching" program are in the public domain, and any current or former customer, former employee or even one reviewing its website can easily copy its program if one chooses to. There is nothing illegal with doing so (even though Fit Chicks has not done this). In fact there are many independent studios offering very similar or identical small group training and nutrition coaching, many run by former employees of Get In Shape For Women franchisees. For example, Axis training in Gainesville, Fl., Fuel Training with 4 locations in Massachusetts and New Hampshire, Desario Training in Dedham, Ma. and many others. There is no confidential information of GISFW of any kind that is being utilized by Fit Chicks. Furthermore, Fit Chicks does not compete with any GISFW studio as there are no GISFW studios within the small geographical area of Fishers, Indiana. GISFW has suffered zero economic loss as a result of Fit Chicks operating and honoring prepaid customer contracts as it has no competing studios in the area that lost customers, or could lose customers, to Fit Chicks. In fact, GISFW already received the 6% royalty and various other fees from the Defendant on these prepaid customer contracts.

Most importantly, the Defendant does not own Fit Chicks and an injunction prohibiting the operation of Fit Chicks on the new owner would certainly disregard and trample on the new owners' private property rights, as well as those of the lessor and the customers who have prepaid customer contracts.

Plaintiff states that the Defendant was provided with confidential information in the form of its operating manual. Defendant never even read the operating manual and has returned it to GISFW. There is certainly no confidential information, trade secrets or information of any kind, in the operating manual that is being used by the Defendant or by Fit Chicks.

C. **The Plaintiff severely misled the Defendant with improper disclosures in the FDD. It subsequently charged the Defendant tens of thousands of dollars in improper fees that were not disclosed in the Franchise Agreement and failed to provide virtually any marketing or operational support to the Defendant. Instead, the Plaintiff's CEO has taken the funds that should have been used to provide the support promised in the Franchise Agreement as stockholder distributions at an unprecedented level of over 45% of revenues in the last three years.**

The Plaintiff states that the Defendant "unilaterally and without justification disassociated from GISFW". That is far from the case. First, the Defendant was enticed into the GISFW franchise with inaccurate and improper disclosures. Subsequent to joining the franchise, the Defendant was charged many illegal fees that were not disclosed in the franchise agreement she signed.

The Defendant believes it is critical for the court to understand that she has no legal remedy of any kind to address these violations. The franchise agreement states that the only remedy the Defendant has for disputes is filing an arbitration in the State of Massachusetts (See Exhibit 7). However, including the filing fee, legal fees and other costs that the Defendant would have to pay to do so, the cost would likely exceed $100,000. This is money that the Defendant simply does not have, and even if she did, the legal costs would likely far exceed the settlement claim. As a result, the Plaintiff has had free reign to mislead many potential franchisees, who face the same legal quandary, into investing in a GISFW franchise and then charging them all sorts of fees that were not disclosed in the franchise agreement. Due to the legal restrictions the Plaintiff put in place and its refusal to even consider changing its illegal behavior when asked to by multiple franchisees, there is nothing whatsoever that the franchisees, including the Plaintiff, can do about it. This is the first time, to the Defendants knowledge, that these misleading and improper disclosures and illegal fees are being even brought to the attention of any governmental entity.

Note that this limitation of legal remedy in the Defendants franchise agreement, appears to be in violation of the Indiana Deceptive Franchise Practices, which states that "It is unlawful for any franchise agreement entered into between any franchisor and a franchisee who is either a resident of Indiana or a nonresident who will be operating a franchise in Indiana to contain any of the following provisions:
(10) Limiting litigation brought for breach of the agreement in any manner whatsoever."

Furthermore, the Indiana Deceptive Franchise Practices Law – Section 23-2-2.7-1 (1) states that "it is unlawful for any franchise agreement entered into between any franchisor and a franchisee who is either a resident of Indiana or a nonresident who will be operating a franchise in Indiana to contain any of the following provisions:
(1) Requiring goods, supplies, inventories, or services to be purchased exclusively from the franchisor or sources designated by the franchisor where such goods, supplies, inventories, or services of comparable quality are available from sources other than those designated by the franchisor."

Here again, the Plaintiff violated Indiana state franchise law by requiring that the Defendant purchase 10,000 postcards every month at a cost of $3,650 (per 10,000 postcards) from Gatehouse Media, GISFW's sole supplier, in spite of the fact that numerous other vendors offer the same printing and service for better prices.

For example, here is an email from Lou DeFrancisco, President of GISFW, making it clear that there is only one sole source vendor for advertising postcards: stating that

The Franchise Agreement states you have to use approved vendors. **Gatehouse is our only approved vendor for the franchise for postcards**. When a vendor requires a certain way to charge for their service, then the customer (our franchisees) must agree to do business with them in that manner.

You are not approved to use an outside vendor to send postcards. The main reason is so that we can drive costs down for the entire franchise when we all use the same vendor.

We are only requiring you send 10,000 postcards every other month, during compelling offer months. We used to require 10,000 every month. Our goal with pulling back was to give owners more flexibility and control in how they spend their marketing dollars. We still believe in multiple impression marketing, and we strongly believe that when we customize the postcards with our local testimonials, and we hit the 10,000 households closest to our studio, that makes a strong, guaranteed impression.

Thank you,

Lou

This requirement to use Gatehouse Media as the sole source vendor is in direct violation of the Indiana Deceptive Franchise Practices Law. It is also notable that GISFW discloses in its 2012 Franchise Agreement that its affiliate receives "free marketing from our designated marketing supplier for the Porter Square, Cambridge Massachusetts studio." The Defendant believes, based on management comments with franchisees, that GISFW receives 20,000 free postcards every other month from this sole source vendor for this studio and perhaps for other corporate owned studios.

Should the preliminary injunction be granted, as a result of expertly worded memorandums by very expensive attorneys financed by improperly charged fees, it would even further embolden GISFW to act even more egregiously and even further ignore the franchise agreement that it signed.

Here is a summary of improper fees charged that were not disclosed or improperly disclosed in the franchise agreement:

1. National advertising Fees: The Defendant's Franchise Agreement states that "Franchisee shall not be required at this time to contribute to the National Advertising Fund." (See Exhibit 12). Nevertheless, the Defendant was charged $300 per month for a contribution to the National Advertising Fund since she began operating her GISFW studio. Not a single dollar of this money was spent on national advertising or any advertising that benefitted the Defendants territory or anywhere in the state of Indiana. The Defendant was charged a total of approximately $6,600 in national advertising charges. There was a reasonable expectation that if the Defendant was charged, she would receive some benefit from the National Advertising Fund expenditures. Instead, none of this money was ever spent to the benefit of the Defendant. In fact, much of this money was never spent on advertising at all. It was taken by the Franchisor as "administrative fees" or "net income" of the National Advertising Fund, which went directly to the Plaintiff's bank account and subsequently withdrawn through stockholder distributions by the CEO. This can be easily proven from GISFW's own documents that it has sent to franchisees including the Defendant and from its audited financial statements in its Franchise disclosure documents.

2. The Defendant has been charged annual meeting conference fees in the amount of approximately $1,000 in 2012, 2013 and 2014. The FDD she signed states that the Defendant would only be responsible for "speakers, meals and activities" (See Exhibit 8). The total charge to all franchisees for the Annual Conference in 2014 was approximately $95,000 including a $30,000 "training fee". The Defendant believes the total charge of approximately $95,000 far exceeds the cost of speakers, meals and activities and therefore the pro rata charge to her was significantly more than permissible per the franchise agreement.

11

3. The Defendant has been charged quarterly meeting fees of approximately $400 to $500 three quarters per year (in quarters when there was no annual conference) and monthly meeting fees of $100 and $50 per month in months there was no annual or quarterly meeting. The total of quarterly and monthly meeting fees charged to the Defendant, even though she did not attend any of these meetings, has yet to be determined precisely but amounts to several thousand dollars. Nowhere in the Franchise Agreement signed by the Defendant is there a reservation of the right to charge for quarterly or monthly meetings.

4. The Defendant has been charged "training fees" of $300 at the rate of $100 per month as part of a group whose studios realized gross revenues of less than $60,000 per calendar quarter. These extra "training fees" total $800 per the Defendants calculation. The presumed training that occurred consisted of a one hour "webinar" per week held by the director of franchise operations (whose salary was already paid for by royalty revenues).

   Per a recent conference call held by the franchisor, they noted that there were 34 franchised locations singled out for the extra fee (in spite of the fact that these were the lowest revenue and therefore least profitable studios, and some of which were losing money). Therefore, the franchisor charged a total of $3,400 for a one hour webinar by a salaried employee and incurs absolutely no out of pocket costs for these webinars.

   This "training fee" is not authorized or reserved under the Defendant's franchise agreement. Because the training does not take place at the Franchisor's location or at the Franchisee's location (the Defendant's studio), it is also not a fee that was disclosed in item 6 of the FDD or permissible per the Franchise Agreement.

5. The Defendant has been charged $75 per month for legacy IT support, which the Defendant believes is virtually non-existent and actually amount spent is far less than $75 per studio. The Plaintiff has minimal out of pocket costs associated with this fee. No supporting invoices have ever been provided to the Defendant for legacy IT fees.

6. The Defendant has been charged nineteen $250 "default fees" totaling $4,750. No such fee was disclosed in the Franchise Agreement. The Defendant believes all default fees were improperly charged.

7. The Plaintiff has required the use of a sole source vendor, Gatehouse Media, for advertising postcards even though nowhere in the franchise agreement does the

Plaintiff reserve the right to specify a sole source vendor. Furthermore, requiring a sole source vendor violates the Indiana Deceptive Franchise Practices Act.

All the while that the Plaintiff has been charging these excessive and illegal fees, its corporate website, which is the only website that the franchisee is allowed to use, is out of date and antiquated, it's market research and marketing support is virtually nonexistent and it maintains a skeleton staff of four corporate salaried staff excluding the company's "compliance officer" whose job largely appears to be issuing default fees to franchisees and enforcing procedures that were never disclosed in GISFW's Franchise Agreements. Another of these four is the Director of Franchise Development, who is focused on trying to sell new locations and resell existing locations, rather than assist current owners, so there are in reality only two corporate employees who are tasked with providing support for the 85 franchise locations. It is no wonder that marketing and operational support for the Defendant has been wholly inadequate.

As a result of the excessive and illegal fees, skeleton staff and starving the franchisees of support and assistance, the CEO and founder has stripped the company of the cash flow that normally would be invested in franchisee support and realized an unheard profit margin. For example, per the 2014 FDD, the franchise revenue was $2.65 million and net income was $1.14 million for a 43% net income margin (See Exhibit 9). Net income was over 45% of revenue for the three years ended December 31, 2014. Stockholder distributions to the CEO were $1.3 million, or 50% of revenue (see exhibit 10). This compares to, for example, Planet Fitness net income margin of 13% and McDonalds net income margin of 17%, even though these franchisors have far greater scale, or ability to spread corporate costs over a larger base of franchisee revenue.

The abuses have only gotten worse as the Plaintiff has realized that there are no practical remedies available to franchisees under the law due to its one sided franchise agreement and unethical and illegal conduct.

The following chart shows the "Franchise Support Fees" per average studio per the company's FDD filings. These fees, which are in reality default fees, meeting fees, webinar fees at the rate of over $3,000 per hour (in the aggregate) and other fees have increased at over 25% per year for the last three years. This has allowed the Plaintiffs net income to increase in 2014 by over $100,000 even though its royalty revenue declined by almost $100,000 (see Exhibit 9).

"Franchise Support Fees"

|  | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Franchise Support Fees | 4,586 | 93,730 | 310,772 | 388,875 | 459,784 |
| Ave franchise units |  | 73 | 94.5 | 94 | 88 |
| Franchise Support Fees per store |  | 1,284 | 3,289 | 4,137 | 5,225 |
| y/y % |  |  | 156.1% | 25.8% | 26.3% |

Source: 2014 Franchise Disclosure Document

**D. While these numerous fees were not disclosed in the Franchise Agreement, the Plaintiff also made financial representations that mislead the Defendant about the financial performance of owning a studio.**

For example, the FDDs contain representations on operating expenses, commonly with disclaimers indicating that these are corporate studios. However, corporate Studios, including the ones in Mass. and CA., have been getting free advertising postcards from Gate House Media. This free benefit of 20,000 postcards every other month, is close an approximately $7,000 bimonthly expense (or $42,000 annual expense) which is not reflected in average expenses that GISFW disclosed.

Furthermore, the Plaintiff has disclosed Top 10 (franchisee) revenues with average expenses for the Top 10 which it has no visibility into, because the franchisees do not report their expenses to the franchisor. Disclaimers do not protect the franchisor from willful misrepresentation of facts.

"The *Hanley* case serves as a reminder to franchisors of the importance of ensuring that they have a reasonable basis for each of their financial representations and cost projections. When basing FPRs or cost projections on the results of company-owned operations, it is critical to ensure that significant variations between the franchise business model and company-owned businesses are both accounted for and adequately explained to prospective franchisees." This was never done.

Also, for example, the representations in item 19 of the FDD are implausible at best. The royalties paid by company owned locations in 2013 were $38,000 which at 6% would equate to sales of $633,333 for three locations. These numbers do not square with the Financial Performance Representation in Item 19. Under the FTC Franchise Rule, reasonable substantiation of the presentations in Item 19 must be made available.

In addition, while the Defendant had discussions with GISFW officials prior to her purchase, she was told that the Fishers studio had 51 clients, when in fact there were only 31 clients. The Defendant was also told that the business is not seasonal and revenues are steady month to month. In fact, the business is highly seasonal for all GISFW studios, being much slower in December and the summer months, for example. Furthermore, the Defendant was told by GISFW officials that monthly revenue was $15,000 per month. After her purchase, she learned in reality it was about 33% lower than that, about $10,000 per month.

Of course, all these improper disclosures and improper fees not in accordance with the franchise agreement were hidden from the Defendant, who does not have a legal or accounting background. The Defendant relied on the assumed good faith and ethics of the Plaintiff. Clearly, the Defendant was misled every step of the way. An example of the Plaintiffs marketing of its franchise sales is shown in Exhibit 11, "How to Open Your Own Studio with $0 Money Down". The Plaintiff knows that it can collect a $30,000 franchise fee, watch an undercapitalized Franchisee go under, and then come in and purchase the studio for one dollar. It has done so on many occasions per discussion with other franchisees.

**CONCLUSION:**

For the foregoing reasons, the Defendant Rosalyn R. Harris prays for the Court to: 1) Deny the Plaintiffs motion for a Preliminary Injunction prohibiting a third party Fit Chicks LLC from operating a fitness and coaching studio in Fishers, Indiana; and 2) provide reasonable attorney fees to the Defendant to allow this honorable court to weigh in on the egregiousness of the Plaintiffs financial misrepresentations and disclosure violations in its FDD, numerous illegal fees charged to the Defendant and violations of Federal franchise law and the Indiana Deceptive Franchise Practices Act.

Respectfully Submitted,

*[signature]*

Rosalyn Harris
9726 Ambleside Drive, apt#302
Fishers, IN 46038
Tel 317-361-9200

CERTIFICATE OF SERVICE

I, Rosalyn Harris, certify that on this /4th day of August, 2015, I mailed a copy by U.S. mail of the foregoing to Lee Harrington of Nixon Peabody, 100 Summer Street. Boston, Ma. 02110 and to Sarah Carlin at Get In Shape Franchise, Inc., 75 2nd Avenue, Suite 220, Needham, Ma. 02494

*[signature]*

Rosalyn Harris
9726 Ambleside Drive, apt#302
Fishers, IN 46038
Tel 317-361-9200

15